JOHN R. EMERY, FREDERIC W. STEVENS, EUGENE STEVENSON, LINDLEY M. GARRISON, EDMUND B. LEAMING, JAMES E. HOWELL AND EDWIN R. WALKER, VICE-CHANCELLORS.

---

THE TRUSTEES OF PRINCETON UNIVERSITY

*v.*

EDMUND WILSON, attorney-general, et al.

[Decided December 10th, 1910.]

1. Where the duty of a trustee is a matter of doubt, he is entitled to the directions of a court of equity, that he may be safe in proceeding to execute the trust, the rule applying with full force to the trustees of a public charity; and where the trust is created by will, the proper construction of the will is a necessary prerequisite to the giving of directions.

1

2. In a suit for enforcement of a public trust or charity, the attorney-general is the proper suitor, and he may file an information either of his own motion or upon the relation of any party concerned, and where a bill is filed by trustees of a public charity, seeking directions as to the execution of their trust, the attorney-general is a proper party defendant, as representing the public interest.

3. In a suit by trustees of a public trust for directions as to execution of the trust, the heirs-at-law or next of kin of the donor are not necessary parties defendant, in view of the fact that no right of reverter arises upon the breach or violation of a public trust.

4. In construing a provision of a will, creating a trust, the intent of testatrix as expressed by the language employed in the will as a whole is controlling.

5. The word "ground" is defined as meaning land; estate; possession; and in the plural, garden; land; field belonging to a homestead; land appropriated to some special use; and the limited meaning of the word "grounds," as connoting appurtenancy to a homestead or other building, is not ordinarily to be adopted, unless it appears from the context that the word is employed in connection with some particular building or group of buildings, or that there is an intent to distinguish between the "grounds" and the other lands of the same owner.

6. A testatrix in one item of her will devised to trustees "my house and grounds," with all the buildings standing within such grounds, to be used for public purposes, and in a subsequent item gave the remainder of her estate to the trustees of a university to be devoted to the construction "upon the grounds of the said university" of a building to be used for certain purposes.—*Held*, that the term "university" was not used to designate any building or group of buildings, but the corporation, the preposition "of" denoting proprietorship and not location, and the word "grounds"—evidently used in the latter item to express the rhetorical antithesis between "my house and grounds," used in the previous item, upon which a public hall and garden were to be established, and the establishment of the building upon the grounds "of the said university" —will not be deemed to bear a limited or special meaning confining it to such lands as lie immediately adjacent to and are used in connection with the existing buildings of the university, but to embrace any land owned by the university so located as to make the building to be erected available for the purposes intended; and a tract not contiguous to the original and central campus upon which the existing university buildings are situated, but separated therefrom in part by a railroad, in part by a public street, and in part by land of other owners, the only communications between the tract and the central campus being by means of streets or lanes, would be "grounds of the said university," within the meaning of the will, where owned by the university.

On bill, answers and proofs.

*Messrs. Lindabury, Depue & Faulks,* for the complainants.

*Mr. Nelson B. Gaskill,* assistant attorney-general, for the attorney-general.

*Mr. Frank S. Katzenbach, Jr.,* for the executors of Josephine A. Thomson Swann.

PITNEY, CHANCELLOR.

The case, shortly stated, is as follows: The complainants, the trustees of Princeton University, have received from the executors of Josephine A. Thomson Swann, deceased, late of the borough of Princeton, a fund of approximately $325,000, which, by the thirteenth paragraph of her will, was given to the complainants, in trust, for the erection, construction and maintenance "upon the grounds of the said university" of a building to be known as the "John R. Thomson Graduate College. of Princeton University." The pertinent language of the will will be quoted below. It provides, among other things, that Mrs. Swann's executors shall be consulted respecting the character and location of the proposed graduate college. The terms of the bequest are manifestly such as to create a public trust or charity.

In view of doubts that have arisen as to the construction of the clause in question, the bill is filed for the purpose of procuring the aid and direction of this court, to the end that the trust may be executed according to the real intent and purpose of the will, and with due regard to the interests of the public and the protection of the complainants.

The complainants are desirous of erecting the proposed graduate school as soon as practicable, have consulted Mrs. Swann's executors respecting its character and location, and have determined, with the approval of the executors, that it should be located upon a tract of land in Princeton comprising two hundred and twenty-two acres, known as the Springdale farm and commonly called the "golf links." This tract, while now known as a part of the university campus, is not contiguous to the original and central campus upon which the existing university buildings are situate; it is separated therefrom in part by the Princeton branch of the Pennsylvania railroad, in part by a

public street known as Alexander street, and in part by lands of other owners; the only communication between the golf links and the central campus being by means of streets or lanes.

The desirability of locating the Thomson Graduate College upon the golf links site has become accentuated because of changed conditions since the death of Mrs. Swann, brought about by a gift proposed to be made by Mr. William Cooper Proctor, an alumnus of the university, and a bequest actually made by the will of Isaac C. Wyman, deceased, another alumnus; Mr. Proctor's offered donation being intended to assist in the development of the proposed graduate college, and being conditioned upon the location of such college buildings upon the golf links property, and Mr. Wyman's bequest being given for a like purpose, and being so large in amount that it could not be properly employed in the development of a graduate college upon the central campus, for want of sufficient and suitable ground space in that location.

The bill prays that by the decree of this court the true interpretation and construction of the thirteenth clause of Mrs. Swann's will may be determined, and that it may be thereby established either, *first,* that under the will the trustees of the university are authorized to establish and construct the John R. Thomson Graduate School upon the land known as the Springdale farm, or golf links, or, *second,* that in view of the changed conditions and circumstances above mentioned, the graduate school may be established and constructed upon the site referred to, notwithstanding the construction of the will.

The attorney-general, by his answer, submits himself to the judgment and decree of the court, and prays that the will may be construed in the respects referred to, and that the trust created by the thirteenth paragraph may be established and executed as a public charity under the direction of the court. Mrs. Swann's executors are joined as parties defendant. They have answered, submitting themselves to the decree of the court. Upon these pleadings, and upon proofs taken in open court in the presence of all parties, the cause was brought to hearing.

The complainants invoke, in the alternative prayer of their bill, the doctrine of *cy pres.* If this doctrine is to be resorted

to, it, of course, becomes material to inquire whether the erection of the John R. Thomson Graduate School upon the central campus is impracticable, and whether its location upon the golf links is warranted by the legitimate application of the doctrine; but if the will permits the trustees of the university to select a site upon the golf links, then (since they have the approval of the executors of Mrs. Swann for that location) the reasons that have impelled them to that selection are immaterial except upon the question of their *bona fides.* Upon this point it is sufficient to say that the proofs render it clear—there being nothing to arouse even a suspicion to the contrary—that in selecting the site upon the golf links, subject to the sanction of this court, the trustees have acted upon the fullest and most serious consideration, upon grounds that concern solely their duty to the trust, and that their discretion has been most fairly exercised.

I deem it entirely clear that the complainants are entitled to the aid of this court, and that they have properly invoked its jurisdiction, and have brought all necessary parties before the court.

Where the duty of a trustee is a matter of doubt, he is entitled to the aid and direction of a court of equity, in order that he may be safe in proceeding to execute the trust. Where the trust is created by a will, the proper construction of the will is a necessary pre-requisite to the giving of directions to the trustee. The rule entitling trustees to the aid of this court applies with full force to the trustees of a public charity. *Attorney-General* v. *Moore's Executors, 19 N. J. Eq. (4 C. E. Gr.) 503.*

In suits for the enforcement of such a public trust or charity, the attorney-general is the proper suitor, and he may file an information either of his own motion or upon the relation of any party concerned. *MacKenzie* v. *Trustees of Presbytery, 67 N. J. Eq. (1 Robb.) 652, 683.*

And where a bill is filed by the trustees of a public charity seeking directions as to the mode of executing their trust, the attorney-general is a proper party defendant as representing the public interest. *Harvard College* v. *Society, 3 Gray (Mass.)*

*280, 282; Jackson* v. *Phillips, 14 Allen (Mass.) 539, 579; Lanning* v. *Commissioners of Public Instruction, 63 N. J. Eq. (18 Dick.) 1, 8; MacKenzie* v. *Trustees of Presbytery, 63 N. J. Eq. (1 Robb.)* at p. *686; Trenton Society* v. *Howell, 63 Atl. Rep. 1110; Larkin* v. *Wikoff, 75 N. J. Eq. (5 Buch.) 465.*

No question is raised about the propriety of joining the executors of Mrs. Swann as defendants, and I, therefore, have not considered whether it was necessary to join them.

It does not seem to me that the heirs-at-law or next of kin of Mrs. Swann are necessary parties. No right of reverter arises upon the breach or violation of a public trust. *Mills* v. *Davison, 54 N. J. Eq. (9 Dick.) 659, 667; MacKenzie* v. *Trustees of Presbytery, 67 N. J. Eq. (1 Robb.) 652, 678.*

Coming, therefore, to the merits, the question for solution is, what is the proper meaning of the phrase, "upon the grounds of the said university," as employed in the thirteenth or residuary clause of Mrs. Swann's will, in respect of the location of the proposed graduate college building.

Two doubts have been suggested, viz., *first,* assuming that at the time the will was written the golf course had been the property of the university, was it a part of "the grounds of the said university," or is the term "grounds" to be understood as meaning only the land immediately surrounding the existing university buildings and connected therewith, as distinguished from the outlying lands of the university?

*Second.* If the golf course is, in respect of its location, properly to be considered as a part of "the grounds of the university," is it excluded from consideration because of the fact that it had not become the property of the university when the will was written?

Upon both of these questions the intent of the testatrix, as expressed by the language employed in her will, must of course be controlling. And not only the thirteenth paragraph but the entire context must be regarded. It so happens that in the preceding paragraph the word "grounds" is repeatedly employed, and I therefore deem it important to quote the twelfth and thirteenth paragraphs *in extenso.*

"*Twelfth.* I give, devise and bequeath unto William Milligan Sloane, of Princeton, New Jersey, Bayard Stockton, of Princeton, New Jersey, and Francis Larkin, Jr., of Ossining, New York, their heirs, executors, administrators and assigns, my house and grounds known as "Belgarde" situate at Number 50 Stockton Street, in the Borough of Princeton, and all the buildings standing within said grounds; also the portraits of my late husband, John R. Thomson, and myself; my copies of the old Masters; my bronze by Rauch (Amazon and Tiger) with stand; my two marble Sphinxes; my marble pieces known respectively as 'The Dying Gladiator' and 'The Boy Playing with Jackstones;' my carved teak-wood settee and chair; my German carved walnut settee and chairs; my two Siamese bronze Temple pieces; and my Japanese Warrior in Armor; all of which are now contained in my said House. Said property shall be held by my said Trustees their successors and assigns, in perpetual trust for the use of the municipal corporation known as 'The Mayor and Council of the Borough of Princeton' and the inhabitants of said Borough as and for a public hall and garden. My trustees shall expend, out of my estate, the sum of twenty thousand dollars in remodeling the said house and fitting the same for gatherings, large and small, and in affixing therein or thereto a tablet, upon which shall be engraved the words 'Thomson Hall.' They shall furnish an office in one of the buildings on said property for the use of the Mayor of said Borough, and also a Council Chamber for the meetings of the Municipal Council, without charge. They shall maintain the said grounds substantially as they have been laid out and planted by me for use as a public park. They shall cause the said portraits, pictures and art objects to be placed on exhibition in one or more suitable rooms in said hall to be reserved for that purpose, and shall add thereto, from time to time, such other pictures and objects of art as may be donated or loaned to them for that purpose and as shall be deemed by them to be of sufficient educational or artistic value, and they shall admit the public to the said room or rooms, at such times and under such reasonable regulations as they may prescribe. My said trustees shall have authority, from time to time and at all times, to rent any of 'the rooms in any of the said buildings for social, political or other public gatherings that will not interfere with the uses aforesaid, and they shall apply any and all rent and income derived from such letting to the maintenance, repair and improvement of said buildings and grounds. And for the further purpose of maintaining the said buildings and the said grounds, I give and bequeath to my said Trustees the sum of fifteen thousand dollars, to be invested by them and kept invested in good interest bearing securities, and the income received therefrom to be applied by them, from time to time, as required, to the care and maintenance of the said grounds and the said buildings. My said Trustees shall have power and authority, from time to time, to make all such rules and regulations concerning the use, care and preservation of said grounds and buildings as may be reasonably necessary, and the same to alter, amend or repeal at their discretion. Upon the death or resignation of any of said Trustees, I direct the survivors or survivor of them to apply to the Chancellor of this state to appoint a successor to the one so dying or resigning, and the person so appointed shall be thereby invested with all the power and

discretion in the execution of this trust that he would have had if named herein."

"*Thirteenth.* I give, devise and bequeath all the rest, residue and remainder of my estate, of whatsoever kind or nature, and wheresoever the same may be situate, unto the 'Trustees of Princeton University,' their successors and assigns forever, in Trust, nevertheless, to devote the same or the proceeds thereof, as soon as practicable, to the erection and construction, upon the grounds of the said University, of a building to be known as 'The John R. Thomson Graduate College of "Princeton University;"' the said building to contain sitting and sleeping rooms for officers and students, with a dining hall, kitchen and the necessary appurtenances, in a portion of the building entirely separate and apart from such sitting and sleeping rooms. The living rooms shall be rented at the best prices they will command to Graduate, Senior and Junior students of the University, and the income derived from such rentals after deducting the cost of maintaining said building, shall be devoted to the maintenance of as many fellowships of four hundred dollars each as the funds will provide. These fellowships shall be awarded by a committee to be designated from time to time by the Trustees of the University, and shall be given to Bachelors of Art of the male sex of high character and ability who would not otherwise be able to continue their studies at the University, and they shall be terminable at the discretion of said Committee. The Fellows, to a number not exceeding thirty shall have unfurnished rooms in said building free of rent. The tuition fees of the Fellows shall be remitted by the Trustees as a condition of this gift. The number and situation of the rooms allotted to the officers and Fellows shall be fixed by the said Committee, but in no case shall the rent of more than thirty rooms be remitted. The board at the College table shall be regulated by the Committee, and the Fellows of the Graduate College shall pay the regular charge therefor, and they shall eat at the College table, unless dispensed therefrom by the Dean of the Graduate Faculty for good and sufficient reasons. Other students of the University may be admitted to the College table at the discretion of the said Dean.

"I further direct that the said fellowships shall be bestowed upon Bachelors of Arts who are engaged in literary and scientific research other than that directly connected with professional studies so-called; that said fellowships shall be known as 'The John R. Thomson Fellowships;' that in making appointments to said fellowships, Bachelors of Arts of Princeton University shall have preference in the order named— *first*, from the Borough of Princeton; *second*, from the County of Mercer, and *third* from other parts of the State of New Jersey; provided always, that the attainments of such persons are fully equal to those of other applicants. In default of such candidates, the appointments are to be open to male Americans holding the degree of A.B. from any approved college or university. No one of said fellowships shall be given to or held by a married man.

"I further direct that in case the number of applicants for said fellowships who come within the above designations should not, at any time or times, be sufficient worthily to fill all the said fellowships, then the surplus moneys arising from said rentals shall be placed in an endowment fund, the income of which, after the fund reaches the sum of one

hundred thousand dollars, shall be applied to a University professorship in American History.

"It is my desire that my executors shall be fully consulted respecting the character and location of the said Graduate College, which is designed by me for a permanent memorial of the interest felt by my late husband, John R. Thomson, in the higher literary and scientific education of his countrymen."

The twelfth paragraph shows that the word "grounds" is used there as meaning the lot of land appurtenant to the residence of the testatrix, and, manifestly, it includes the entire lot upon which that residence stands.

In what sense, then, did she employ the term "grounds" at the beginning of the thirteenth paragraph, which provides for the erection and construction of a graduate college building "upon the grounds of the said university?" Evidently, I think, one reason for using this phrase was to express the rhetorical antithesis between *"my* house and grounds" upon which a public hall and garden were to be established, the building to be known as "Thomson Hall," and the establishment of the "John R. Thomson Graduate College of Princeton University" upon the grounds *of the said university.*

The word "ground" (in the singular) is of most extensive signification. In an early edition of Webster's Unabridged it is defined as meaning "land; estate; possession;" an instance of its use in the plural being quoted from Dryden, viz.: "Thy next design is on thy neighbor's grounds." In the latest edition of Webster this definition is amplified as follows:

"Land; estate; possession; field; esp. (pl.) the gardens, lawns, fields, etc., belonging to a homestead; as, the grounds of the estate are ⁻well kept up."

In the Century Dictionary we find the following definitions:

"6. Land appropriated to individual ownership or use; cultivated land; a landed estate or possession; specifically, the land immediately surrounding or connected with the dwelling-house or other building and devoted to its uses; commonly in the plural. 7. Land appropriated to some special use (without reference to ownership), as the playing of games; as baseball grounds; cricket grounds; hunting grounds, etc"

It seems to me that the limited meaning of the word "grounds," as connoting appurtenancy to a homestead or other building, is not ordinarily to be adopted unless it appears from the context that the word is employed in connection with some particular building or group of buildings, or that there is an intent to distinguish between the "grounds" and the other lands of the same owner, as between lands reserved for home uses and outlying lands devoted to agriculture, pasturage, or the like.

In the thirteenth paragraph of the will the phrase is, simply, "the grounds of the said university." The term "university," as I take it, does not here mean any building or group of buildings, but the corporation. The preposition "of" in this connection denotes, I think, proprietorship, and not location; a view that seems to be strengthened by the circumstance of antithesis already referred to.

And the antithesis also relieves us from the necessity of adopting precisely the same meaning for the word "grounds" in the thirteenth paragraph that it bears in the twelfth; so that if we should conclude that in the twelfth it meant a mere curtilage, it would not follow that it conveyed identically the same idea in the thirteenth, for the writer may well have intended to contrast the lands referred to, not only in respect to their ownership but in other respects.

These criteria indicate that the word "grounds," in the thirteenth paragraph, bears no limited or special meaning that would confine it to such land as lies immediately adjacent to, and is used in connection with, the existing buildings of the university.

But I do not desire to place undue reliance upon these refinements. The main question is, What did the testatrix mean by the language employed? It is extremely improbable that either she or the draftsman of the will studied long over the phrase in question. And we should not study over it so long, nor so minutely, as to lose sight of the fact that the will was doubtless intended to convey the meaning of the testatrix upon a single attentive reading and without prolonged and microscopic scrutiny.

So regarding it, and carefully reading the entire will, the plain impression made upon my mind by the thirteenth para-

graph is that the testatrix intended the proposed graduate college to be located upon the land owned by Princeton University, the building to form a part of the equipment of the university, and to be so located as to be available as a place of residence for students of the university; its location, subject to these qualifications, to be determined upon by the trustees after consultation with her executors. This location is not intended to be confined to such portions of the land of the university as are closely adjacent to the existing buildings and, in a sense, appurtenant to them and devoted to their uses; rather is it implied that the proposed graduate college shall stand surrounded by some adequate space of ground as its own appurtenance.

In my opinion the proposed site upon the golf course is, in respect of its location, properly to be considered as a part of "the grounds of the university" within the meaning of the will.

The next query is, by what point of time is the question of the ownership of the proposed site by the university to be tested.

The original will, in which the bequest is contained, bears date July 30th, 1902. By codicil, dated July 24th, 1905, the testatrix ratified and confirmed that portion of the will. She died in the month of March, 1906.

The golf links property was purchased in the year 1899 by certain friends of the university who were deeply interested in its growth and development. The conveyance was taken in the name of Messrs. Moses Taylor Pyne, Cornelius C. Cuyler and Stephen S. Palmer, as joint tenants. The money for its purchase was, however, subscribed and paid by a number of persons (twenty-one in all), among whom were the three just named, and these three issued to the several contributors certificates of interest or declarations of trust, setting forth the right of the individuals to participate in any proceeds or profits arising from the lands, whether by sale, lease or otherwise. Up to this point, although the unexpressed purpose would seem to have been to hold the land for the ultimate benefit of the university, there was no legal declaration of any trust in its favor. Afterwards, and prior to the date of the codicil to Mrs. Swann's will, all of the certificates of participation were assigned and transferred to the trustees of the university, who thereupon became the equitable

owners of the property and entitled to receive a deed of conveyance from the three joint tenants. Such a deed was afterwards made, but not until some time after Mrs. Swann's death. It seems to me the date of this conveyance is a matter of no legal significance, and that for present purposes the university must be deemed to have been the owner of the property in question at the date of the codicil.

The evidence shows that the acquisition of the property by the university was publicly announced at the commencement ceremonies in the month of June, 1905 (prior to the date of the codicil), and that Mrs. Swann, who was and for many years had been a resident of Princeton, possessed of remarkable intelligence and keenly interested in the affairs of the university, was probably present when this announcement was made. I confess, however, that I attribute no especial significance to this circumstance. It requires no such evidence to raise the presumption that the testatrix was familiar with the circumstances in view of which she made her testamentary dispositions.

It is familiar law that a will of personalty speaks as of the death of the testator. In the absence of statute a devise of land is treated as being in the nature of a conveyance, and as passing nothing that was not owned by the testator at the date of the will. *1 Jarm. Wills (R. & T. ed.) 155; Gardner's Executors* v. *Gardner, 37 N. J. Eq. (10 Stew.) 487, 490.* We have a statute which provides that real estate acquired by a testator after making his will shall pass by any devise sufficient to include it, unless a contrary intention be manifest on the face of the will. *P. L. 1851 p. 218 § 3; Gen. Stat. p. 3761 pl. 24.*

Of course, this statute has no reference to lands that are not the subject of a devise, and are referred to only for the purpose of defining or imposing a limitation upon some testamentary disposition. Nor am I inclined to think that the common-law rule as to devises applies to lands thus referred to. If, however, the rule of the common law did apply, it must be applied as of the date of the codicil, and not of the original will, for the codicil amounts to a republication. *Stephens' Executors* v. *Milnor, 24 N. J. Eq. (9 C. E. Gr.) 358, 374; Doe d. York* v. *Walker, 12 M. & W. 591; Emuss* v. *Smith, 2 De G. & S. 722.*

I am inclined to think the will before me, in the reference to "the grounds of the said university," is to be understood as speaking at the time of testatrix's death. But, not to go beyond the exigencies of the case, it is, I think, entirely safe to treat it as speaking as of the date of the codicil. So treating it, the ownership of the golf links by the university at that time was of so substantial a character as to bring this property within the descriptive clause in question.

I conclude that the complainants are entitled to a decree establishing their right to employ the Swann bequest in the manner proposed by them, and this upon the fair interpretation of the testamentary provisions, and without resort to the doctrine of *cy pres.*